**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KIMBERLY A. WARNER | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-CV-983 (JCH) |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT | : | JULY 3, 2013 |
| HEALTH CENTER, CORRECTIONAL | : | |
| MANAGED HEALTH CARE | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 43)**

**I.     INTRODUCTION**

The plaintiff Kimberly A. Warner ("Warner") brings this action against her former

employer, University of Connecticut Health Center, Correctional Managed Health Care

("UCHC"), alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e et seq ("Title VII").  Pending before the court is defendant UCHC's

Motion for Summary Judgment (Doc. No. 43).  For the following reasons, the Motion for

Summary Judgment is granted.

**II.     STATEMENT OF FACTS**

Warner was employed as a Rehabilitation Therapist 2 by UCHC from February

2007 to August 2012.  Pl.'s Local Rule ("L.R.") 56(a)(2) Stat. ¶ 2.  Warner was assigned

to York Correctional Institution ("York") at all times during her employment with UCHC.

Id. at ¶ 3.  Since 2007, Warner served in the Mental Health Group as a member of the

Social Rehabilitation Unit.  Id. at ¶¶ 4, 15.  She also worked with the Youthful Offender

Team on the Restricted Housing Unit.  Id. at ¶ 15.

As a Rehabilitation Therapist 2 at York, Warner was responsible for planning and

implementing professional therapy programs in a recognized therapeutic discipline for

1

persons with physical, mental, or emotional disabilities.  Id. at ¶ 5.  She planned and implemented these programs—related to anger management, conflict resolution, coping skills, and exercise—in collaboration with the Supervising Psychologists, Clinical Social Workers, and other staff within the Mental Health Group.  Id.  As a Rehabilitation Therapist, Warner's job assignments and caseloads were subject to change based on the needs of the facility.  Id. at ¶ 6.  As such, Warner could have been assigned to any unit within the Mental Health Group.  Id.

York's Director of Clinical Services, Steven Lazrove, M.D. ("Dr. Lazrove"), exercised overall supervision over the Mental Health Group.  Id. at ¶ 7.  In March 2009, Linda Preato ("Preato") filed a complaint against Dr. Lazrove with the University of Connecticut Office of Diversity and Equity ("ODE").  Pl.'s L.R. 56(a)(2) Stat., at 15, ¶ 1.  ODE is an investigative unit within the University of Connecticut charged with investigating internal complaints of discrimination.  Id. at ¶ 10.  Preato alleged that she was "subjected to sexual harassment by Dr. Lazrove in that he made unwanted comments and remarks of a sexual nature to her and in her presence."  Def.'s Mem. in Supp. Mot. Summ. J., Ex. 1, Dep. Ex. 3 (ODE Report); Pl. L.R. 56(a)(2) Stat., at 15, ¶ 1.

On April 15, 2009, Warner was interviewed by ODE as part of the internal investigation into sexual harassment by Dr. Lazrove.  Id. at ¶ 9.  The ODE investigation into sexual harassment began in March 2009, and ended in May 2009, prior to the filing of any Complaint with the Equal Employment Opportunity Commission ("EEOC").  Id. at ¶ 11.

During the April 15 interview, Warner discussed comments made by Dr. Lazrove.  Id. at ¶ 12.  Specifically, Warner was asked about a comment Dr. Lazrove made

regarding how female inmates should be taught to do more than work in a salon and give bikini waxes.[1]  Def.'s Mem. in Supp. Mot. Summ. J., Ex. 1, Dep. Ex. 3.  Warner took exception to this comment because it "lacked cultural sensitivity" and discounted the value of the cosmetology profession.  Pl.'s L.R. 56(a)(2) Stat. ¶ 12.  Further, Warner said she was insulted and shocked "as a woman and as a woman of color" by Dr. Lazrove's comments, which she felt were degrading and discriminatory towards women in general.  Id. at ¶ 13.  Warner thought Dr. Lazrove's comments were inappropriate given that he was new to York and in the position of lead psychiatrist.  Id.  Warner also complained about a comment regarding whipping women into shape like horses.[2]  Id. at 17, ¶ 8.

At no point during the interview did Warner expressly state that she, or anyone else at York, was sexually harassed by Dr. Lazrove.  Id. at ¶ 14.  Nor did she expressly state that she, or anyone else at York, suffered a discriminatory employment practice. Id.  However, according to Warner, she was not asked these questions.  Warner Dep. at 31:9-24.

On August 6, 2009, Warner was reassigned so as to work only with the Social Rehabilitation Unit (and no longer with the Youthful Offender Team in the Restricted

---

[1] It is unclear from the record the specific statement made by Dr. Lazrove.  Most of the interviewees discuss the comment as one regarding the type of work inmates should be taught to perform.  However, at one point in the ODE report, Preato states that Dr. Lazrove, after commenting on the need to teach something more than cosmetology, said to the staff, "although some of you use this to get bikini waxes."  Def.'s Mem. in Supp. Mot. Summ. J., Ex. 1, Dep. Ex. 3, at 10.  Warner never described the statement as such.

[2] In her deposition, Warner stated that Dr. Lazrove "talked about this picture he had; there was a cow in the middle and horses on the outside, and that the horses were like women that need to be whipped into shape, and how they don't touch the cow."  Warner Dep. at 26: 7-11.  This statement about whipping horses was mentioned by other interviewees.  The statement as repeated by others did not include a particular reference to women.  Def.'s Mem. in Supp. Mot. Summ. J., Ex. 1, Dep. Ex. 3, at 12 (describing how Dr. Lazrove commented that there are different ways horses respond to a whip, and how one female employee (not Warner) responds in a particular way).

Housing Unit).  Id. at ¶ 15.  Warner was reassigned at the request of the Department of

Corrections ("DOC").[3]  Pl.'s L.R. 56(a)(2) ¶ 16.  In a letter sent from Deputy Warden

Karen Oien to Dr. Lazrove and Ron LaBonte ("LaBonte"), Deputy Warden Oien

"requested that Ms. Warner be removed from the Youthful Offender team and that

corrective action be taken to address her behavior."  Def.'s Mem. in Supp. Mot. Summ.

J, Ex. 1, Dep. Ex. 5.  Deputy Warden Oien described how, at a monthly administrative

meeting for the Youth Offender Team, Warner stated that she used an adult inmate as a

guest speaker during a group meeting with the youthful offender population.  Id.

According to the letter, "Ms. Warner continued to state in a cavalier manner that she

was aware she had been told not to use adult offenders in groups with the youth and

would 'take the hit for it' but felt that she was acting with good therapeutic judgment."

Id.  Deputy Warden Oien stated in the letter that she had told Warner not to use adult

female offenders as speakers with the youthful offender population.  Id.   Warden Kevin

Gause supported Deputy Warden Oien's request.  Id.; see also Def.'s Mem. in Supp.

Mot. Summ. J., Ex. 6.  Although Warner was transferred out of the Youthful Offender

Team, she was not suspended, demoted, or reprimanded.  Pl.'s L.R. 56(a)(2) Stat. ¶ 17.

    The position with the Social Rehabilitation Unit was of a comparable level to the

Youthful Offender Team position.  Id. at ¶ 18.  However, according to Warner, the

reassignment also included a restriction preventing her from working with inmates on an

individual basis.  Id.  Although the assignment to the Social Rehabilitation Unit "provided

---

[3] Warner denies all of paragraph 16; however, she only contests the statement that, "the Commissioner of DOC had previously directed that adult inmates not be used in any capacity with youthful offender inmates for safety and security reasons due to the vulnerability of the youthful offender population and potential undue influence."  Pl.'s L.R. 56(a)(2) Stat. ¶ 16.  Therefore, the remaining statements set forth in UCHC's paragraph 16 are deemed admitted.

the opportunity to work with a challenging inmate population and to develop special programming in close collaboration with the social workers," Def.'s L.R. 56(a)(1) Stat. ¶ 19, according to Warner, the assignment was not desirable because it did not include working with youthful offenders, Pl.'s L.R. 56(a)(2) Stat. ¶ 19.  However, the reassignment did not alter Warner's salary, benefits, schedule, or title, and her tasks were still within the scope of her practice as a Rehabilitation Therapist 2.  Id. at ¶ 20.

On September 29, 2009, Warner received an annual performance evaluation for the period between October 2, 2008, and September 30, 2009.  Pl.'s L.R. 56(a)(2) Stat. at ¶ 21.  The evaluation rated Warner's performance as "excellent" in the categories of knowledge of work, quantity of work, and quality of work.  Id.  The evaluation rated her performance as "good" in the categories of cooperation, judgment, and other elements. Id.  The overall rating was "good."  Id.

According to Warner, her overall performance rating, as prepared by her immediate supervisor Linda Preato, was initially "excellent," until Dr. Lazrove lowered it to a "good" rating.  Id.  According to Warner, Dr. Lazrove also lowered the performance evaluation rating for Lisa Ballint, who was also critical of Dr. Lazrove during her ODE investigation interview.  Id.

According to UCHC, Warner's performance evaluation had not been reviewed or approved by management in accordance with established procedure, which is why it

was not accepted.[4]  Def.'s L.R. 56(a)(1) Stat. ¶ 22.  However, according to Warner, Dr. Lazrove and LaBonte would often change employees' evaluations whenever they wanted.[5]  Pl.'s L.R. 56(a)(2) Stat. ¶ 22.  Warner suffered no loss in pay, benefits, or promotional opportunities nor did she suffer a change in title due to the "good" performance rating.  Id. at ¶ 23.

In November 2009, UCHC clarified the meaning attached to its evaluation rating system.  Id. at ¶ 27.  According to the clarification, "[w]hen we do our job and do it consistently well, that merits an evaluation score of Good.  Going beyond what is expected—demonstrating extra effort, motivation, dedication, teamwork—that is what will now be required to merit a rating of Excellent."  Id.

On February 4, 2010, Warner filed a Complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  Id. at ¶ 25.  On September 29, 2010, Warner received her annual performance evaluation for the period between October 1, 2009, and September 30, 2010.  Id. at ¶ 26.  The evaluation rated Warner's performance as "excellent" in the categories of knowledge of work and quality of work. Id.  The evaluation rated her performance as "good" in the categories of quantity of

---

[4] Warner argues that the court may not rely on the Affidavit of Robert H. Berger, MD, the Director of Mental Health and Psychiatric Services, because Berger is "an indisputably biased witness."  Pl.'s L.R. 56(a)(2) Stat. ¶22.  However, Warner cites cases for support of this argument, which are not on point. See Ferraresso v. Town of Granby, 646 F.Supp.2d 296 (D. Conn. 2009) (discussing affidavits attached to Motions for Summary Judgment that contradict deposition testimony); Dunn v. Nordstrom, Inc., 260 F.3d 778, 785 (7th Cir. 2001) (discussing how competing affidavits from plaintiff and defendant raise a dispute of material fact).  To the extent that Warner offers conflicting evidence, the court will note the dispute of material fact; however, to the extent that Warner argues that Berger's Affidavit should be disregarded outright, the court disagrees.

[5] Warner cites to the deposition testimony of David DeCostanza, an employee at York, who stated that, "Steve [Lazrove] and Ron [LaBonte] would dictate to the supervisors how things would go.  I mean, evaluations were changed.  I've never heard of that.  Evaluations were changed on several people. Ron and Steve would sit down with the supervisor's evaluation and change it."  DeCostanza Dep. at 22:3-8.

work, cooperation, and judgment.  Id.  Her overall rating was "good."  Id.  According to

Warner, her evaluation rating was again lowered, this time for the category "quantity of

work," because she took time off under the FMLA.  Pl.'s L.R. 56(a)(2) Stat. ¶ 26.  Again,

Warner suffered no loss in pay, benefits, or promotional opportunities nor did she suffer

a change in title due to the "good" performance rating.  Id. at ¶ 28.  However, according

to Warner, she was not allowed to actively participate in certain in-house presentations.

Id.

     According to UCHC, in November 2010, Warner's clinical responsibilities were

clarified so as to fit within the Department of Administrative Services job description for

a Rehabilitation Specialist 2.  Def.'s L.R. 56(a)(2) Stat. ¶ 29.  According to UCHC, she

was no longer to provide individual psychotherapy to inmates as this was within the role

of the psychologists and clinical social workers, not the rehabilitation therapists.  Id.

However, according to Warner, she never provided individual psychotherapy.  Pl.'s L.R.

56(a)(2) Stat. ¶ 29.  According to Warner, she was told she could not "do one-on-one

skill-based [work] with any of the inmates in the prison," even though her job description

included administering and implementing therapeutic programs and conducting

individual and group activities.  Id.; Warner Dep. at 34:16-18; Def.'s Mem. in Supp. Mot.

Summ. J., Ex. 1, Dep. Ex. 1.

     In January 2011, Warner moved from Building 0 to Building 2 so as to work with

the Social Rehabilitation Unit.  Pl.'s L.R. 56(a)(2) Stat. ¶ 30.  Prior to her move, Warner

had been the only member of the Mental Health Group in Building 0.  Id.  However,

there were other members of the Mental Health Group—including social workers and

supervising psychologists—assigned to Building 2.  Id.  Around the same time, Warner

requested, and was denied, a transfer from the West Side Compound to the East Side Compound.  Id. at ¶ 31.  The denial was due to "facility needs."  Id.

In August 2012, Warner transferred to a Rehabilitation Therapist 2 position at the Department of Mental Health and Addiction Services.  Id. at ¶ 2.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  Id.  In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56€).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. Of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.

2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008)

(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a

non-moving party must point to more than a mere "scintilla" of evidence in order to

defeat a motion for summary judgment).

## IV.    DISCUSSION

UCHC argues that it is entitled to summary judgment because Warner cannot

make out a prima facie case of retaliation.  "Claims for retaliation are analyzed under

the same burden-shifting framework established for Title VII cases."  Treglia v. Town of

Manlius, 313 F.3d 713, 719 (2d Cir. 2009).  To make out a prima facie case of

retaliation, a Warner must show that: (1) she engaged in an activity protected by Title

VII; (2) her employer was aware of this activity; (3) her employer took an adverse

employment action against her; and (4) a causal connection exists between the alleged

adverse action and the protected activity.  Kessler v. Westchester County Dep't of Soc.

Servs., 461 F.3d 199, 204-05 (2d Cir. 2006).  UCHC argues that (1) Warner did not

engage in protected activity when she participated in the ODE internal investigation; (2)

none of the actions of which Warner complains constitute "adverse employment

actions;" and (3) there is insufficient temporal proximity between any protected activity

and any adverse action to suggest a causal connection.  Def.'s Mem. in Supp. Mot.

Summ. J. at 5-14.

A.  Protected Activity

"Section 704(a) of Title VII contains both an opposition clause and a participation

clause, making it unlawful for an employer to retaliate against an individual 'because he

has opposed any practice made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" <u>Townsend v. Benjamin Enterprises, Inc.</u>, 679 F.3d 41, 48 (2d Cir. 2012) (citing 42 U.S.C. § 2000e–3(a)). Therefore, activity that falls within the opposition or participation clauses constitutes "protected activity" within the first prong of the <u>prima</u> <u>facie</u> case.

As UCHC argues, Warner's participation in the ODE investigation does not fall within the participation clause and cannot constitute "protected activity" under that clause.  In <u>Townsend</u>, the Second Circuit held that, "participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause." <u>Id.</u> at 49.  Both parties agree that the ODE investigation began in March 2009, and ended in May 2009, prior to the filing of any Complaint with the EEOC.  Pl.'s L.R. 56(a)(2) Stat. ¶ 11.  Therefore, Warner's participation in that investigation does not constitute protected activity.

Warner, however, argues that her conduct also falls within the opposition clause, thereby constituting "protected activity."  Pl.'s Mem. in Opp. Mot. Summ. J. at 16. According to Warner, she "expressed her opposition to the statements made by [Dr.] Lazrove which she considered to be gender demeaning."  <u>Id.</u>

For a plaintiff's "opposition" to fall within the opposition clause, it must be directed at a practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a); <u>see</u> <u>also</u> <u>Manoharan v. Columbia Univ. College of Physicians & Surgeons</u>, 842 F.2d 590, 593-94 (2d Cir. 1988) (stating that the plaintiff failed to make out a <u>prima</u> <u>facie</u> case of retaliation because his complaints were with regard to conduct that could not constitute an unlawful employment practice within the language of Title VII); <u>Flint v. Tucker Printers,</u>

Inc., 2011 WL 53167, at *5 (W.D.N.Y. Jan. 7, 2011) (citing Int'l Healthcare Exchange,

Inc. v. Global Healthcare Exchange, LLC, 470 F.Supp.2d 345, 357 (S.D.N.Y. 2007) (to

be considered protected activity, the employee's complaint must put the employer on

notice that discrimination prohibited by Title VII is occurring)).  UCHC argues that,

although Warner found Dr. Lazrove's comments to be derogatory and shocking, she

"did not complain to the ODE investigators of discrimination prohibited by Title VII."

Def.'s Mem. in Supp. Mot. Summ. J. at 7 (emphasis added).  "Absent a claim of

unlawful discrimination, general complaints about employment concerns do not

constitute protected activity under Title VII."  Brummell v. Webster Central Sch. Dist.,

2009 WL 232789, at * 5 (W.D.N.Y. Jan. 29, 2009).

    However, to fall within the opposition clause, a plaintiff's complaints need not be

about conduct that, in fact, constitutes discrimination prohibited by Title VII.  "To prevail

on a retaliation claim, an employee . . . must show that he had 'a good faith, reasonable

belief that the underlying challenged actions of the employer violated the law."  Riscili v.

Gibson Guitar Corp., 605 F.Supp.2d 558, 564 (S.D.N.Y. 2009).  To have a good faith,

reasonable belief, "the plaintiff must have believed that he suffered illegal discrimination,

and that belief must have been objectively reasonable."  Id. at 565.

    Warner complained of two comments by Dr. Lazrove: the "bikini wax" comment

11

and the "horse-whipping" comment.[6]  The issue is whether Warner could have had a reasonable belief that making those two comments violated Title VII.  Id. at 566.

There is no evidence that Dr. Lazrove's "bikini wax" comment constituted sexual harassment or gender discrimination in violation of Title VII, nor is there any evidence that Warner subjectively thought such comments were in violation of Title VII.  Warner testified at her deposition that she has "a close friend in the cosmetology business; and they make a really good living . . . so it was just really insulting as meeting a new head, that this was his . . . vision [for female inmates]."  Warner Dep. at 26:21-25, 27:1-2.  She later stated that she though Dr. Lazrove's comments "were degrading, in some way, women, the professions that women can go into; I took it personally as a woman of color because I have someone that's like a family who runs a hair salon."  Id. at 89:18-21. Warner's testimony reflects, first, that her opposition to Dr. Lazrove's comment was because he degraded the cosmetology industry, to which her close friend belongs. Such opposition is not to conduct prohibited by Title VII: Warner did not oppose Dr. Lazrove's statement because it discriminated against women (e.g., because he believed women should only perform certain, stereotypically female jobs, see, e.g., Galdieri-Ambrosini, 136 F.3d at 289 (discussing sex stereotyping)).  Rather, she opposed it because she thought cosmetology was a respectable field for female inmates to enter in

---

[6] Other employees interviewed by ODE referenced a comment by Dr. Lazrove that, "the only thing worse than dyspareunia is no pareunia."  Def.'s Mem. in Supp. Mot. Summ. J., Ex. 1, Dep. Ex. 3, at 28.  Warner stated in her deposition that the ODE interviewers asked her about a word Dr. Lazrove used ("a really big word"), and that, when she realized what the word meant, "then I was like, wow!  That really surprised me.  So I did tell them that . . . I felt, was, you know, inappropriate, referencing sexually with the word and talking about the women at the prison."  Warner Dep. at 27:9-16.  The court assumes that Warner was referring to Dr. Lazrove's comment regarding dyspareunia.  Dyspareunia is defined as "painful intercourse."  Mayo Clinic, Diseases and Conditions, http://www.mayoclinic.com/health/painful-intercourse/DS01044.  Although Dr. Lazrove's comments about sex may be inappropriate, there is no indication this comment was specific to women.

light of her friend's experience.

Second, Warner's testimony makes clear that Dr. Lazrove's comment was regarding the opportunities he wanted for female inmates at York. To the extent that Warner found Dr. Lazrove's comments demeaning to women, it was demeaning to female inmates, who are not protected by Title VII.[7]  42 U.S.C. § 2000e et seq (prohibiting unlawful employment practices) (emphasis added).

As for Dr. Lazrove's comment regarding "whipping horses into shape," the court concludes that it also does not constitute conduct prohibited by Title VII, nor could Warner have reasonably believed that the comment violated Title VII. Warner has difficulty in her testimony recalling what Dr. Lazrove said regarding horses and women. The ODE report does not include a summary of Warner's complaint regarding this statement; however, Warner claims that ODE left out that portion of her interview. Warner Dep. at 28:20-25; 29:9-22. Warner's description in her deposition testimony is that Dr. Lazrove "talked about this picture he had; there was a cow in the middle and horses on the outside, and that the horses were like women that need to be whipped into shape, and how they don't touch the cow." Warner Dep. at 26: 7-11. This statement about whipping horses was mentioned by other interviewees. The statement as repeated by others did not include a particular reference to the fact that women, as a group, are like horses. Def.'s Mem. in Supp. Mot. Summ. J., Ex. 1, Dep. Ex. 3, at 12. As discussed throughout the ODE report, Dr. Lazrove allegedly explained that there are different types of horses. "[O]ne type of horse will jump at the sting of a whip, one type will jump at the sound of a whip, one type will jump at the sight of a whip, and . . . the

---

[7] The court need not determine whether a demeaning comment would constitute conduct prohibited by Title VII had it been directed to a female covered by Title VII.

finest horses will jump at the shadow of a whip." Id. After distinguishing these types of horses, Dr. Lazrove stated that Dr. Julie Guiher, a female employee at York, would jump at the shadow of a whip. Id.

As set forth in the ODE report, Dr. Lazrove's comment—comparing employees (including one female employee) to horses—does not discriminate against female employees. As described, no reasonable jury could find that Dr. Lazrove—by virtue of that statement—treated Dr. Guiher differently because she was a woman. To the extent that the court considers the comment as described by Warner—that women need to be whipped into shape—the court notes that, "[i]n general, a single offensive remark does not violate the law." Riscili, 605 F.Supp.2d at 566 (citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) (noting that while stray remarks do not constitute sufficient evidence to make out a case of employment discrimination, remarks can no longer be deemed "stray" if other indicia of discrimination are properly presented)). Numerous courts within the Second Circuit have held that stray remarks and statements made by a decisionmaker unrelated to the decisional process are not sufficient to prove discrimination. See Schreiber v. Worldco, LLC, 324 F.Supp.2d 512, 518-19 (S.D.N.Y. 2004) (collecting cases). There is simply no evidence that Dr. Lazrove's alleged comments about whipping women into shape resulted in his treating women differently in the workplace. "[T]he retaliation provision of Title VII is intended to prohibit employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC.' It does not 'set forth a general civility code for the American workplace,' nor does it seek to insulate employees from 'petty slights, minor annoyances, and simple lack of good manners.'" McMillan v. Powell, 526 F.Supp.2d 51, 55 (D.D.C. 2007) (internal citations

14

omitted).  In light of this precedent, there is no evidence to support a conclusion that it was objectively reasonable to believe Dr. Lazrove's comment violated Title VII.

The court notes that the <u>Riscili</u> court held that, because the plaintiff's employer instigated an investigation regarding harassment—of which the plaintiff ultimately complained during the investigation and for which he was allegedly retaliated—rather than the plaintiff himself, "a jury could rationally infer that Riscili's belief that the law was violated was reasonable."  <u>Id.</u> at 566-67 (stating that, "his supervisor Nina Miller called him after learning about Vito's alleged harassment from a third-party, presumably because of the possibility that the law (or at the least company policy) had been violated").  Although in this case as well, Warner did not go to her employer to complain, but was summoned to answer questions, the facts of this case are distinguishable from <u>Riscili</u>.  ODE did not instigate this investigation on its own accord as did the supervisor in <u>Riscili</u>.  Preato filed a complaint, to which ODE was obligated to respond.  Therefore, by initiating its investigation, ODE did not suggest to anyone that the alleged conduct was or could be discriminatory: it was merely following protocol.

For the foregoing reasons, the court concludes that there is no material issue of fact concerning Warner's opposition to any practice made an unlawful employment practice under Title VII.  42 U.S.C. § 2000e-3(a).  Because there is no evidence that Warner opposed a practice made unlawful under Title VII, no reasonable jury could find that she engaged in "protected activity."

Having concluded that Warner failed to introduce evidence which would allow a reasonable jury to find that she met the first prong of her <u>prima facie</u> case, the court need not consider UCHC's other arguments as to the remaining prongs of Warner's

prima facie case.  Because Warner has failed to introduce evidence to allow a

reasonable trier of fact to conclude that she has made out a prima facie case of

retaliation, UCHC's Motion for Summary Judgment is granted.

**V.      CONCLUSION**

For the foregoing reasons, UCHC's Motion for Summary Judgment (Doc. No. 43)

is **GRANTED**.  The Clerk is directed to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 3rd day of July, 2013.


                                        _____/s/ Janet C. Hall_____
                                        Janet C. Hall
                                        United States District Judge